1          <u>**TRANSCRIBED FROM DIGITAL RECORDING**</u>

2              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF ILLINOIS
3

4
ROGER STEWARD, et al.,                )
5                                     )
                Plaintiffs,           )
6                                     )
    vs.                               )  No. 3:18-cv-01124-MJR-SCW
7                                     )  East St. Louis, Illinois
HONEYWELL INTERNATIONAL, INC.,        )
8                                     )
                Defendant.            )
9

10

11

                    TRANSCRIPT OF PROCEEDINGS
12          BEFORE THE HONORABLE STEPHEN C. WILLIAMS,
                 UNITED STATES MAGISTRATE JUDGE
13
                      JULY 27, 2018
14

15  ***DISCOVERY DISPUTE CONFERENCE***

16

17

18

19

20

21
    Transcriber:            Stephanie Rennegarbe, CSR, RMR, CRR
22                          Official Court Reporter
                            301 West Main Street
23                          Benton, Illinois  62812
                            (618) 439-7735
24                          Stephanie_Rennegarbe@ilsd.uscourts.gov

25

```
 1   APPEARANCES (BY TELEPHONE):

 2   For the Plaintiffs:    David R. Barney, Jr.
                            Kevin W. Thompson, Esq.
 3                          Thompson Barney
                            2030 Kanawha Boulevard East
 4                          Charleston, WV  25311
                            303-343-4401
 5                          drbarneywv@gmail.com

 6                          Katrina Carroll, Esq.
                            Lite DePalma Greenberg, LLC.
 7                          110 W. Washington Street
                            Suite 1240
 8                          Chicago, IL  60602
                            312-750-1265
 9                          kcarroll@litedepalma.com

10                          James F. Clayborne, Jr., Esq.
                            Clayborne, Sabo & Wagner, LLP.
11                          525 West Main Street
                            Suite 105
12                          Belleville, IL  62220
                            618-239-0187
13                          jclayborne@cswlawllp.com

14                          Victor T. Cobb, Esq.
                            Cooper Law Firm
15                          1525 Religious Street
                            New Orleans, LA  70130
16                          504-309-6989
                            vcobb@sch-llc.com
17
     For the Defendant:     John E. Galvin, Esq.
18                          Fox Galvin, LLC.
                            One South Memorial Drive
19                          12th Floor
                            St. Louis, MO  63102
20                          314-588-7000
                            jgalvin@foxgalvin.com
21
                            Stephanie B. Weirick, Esq.
22                          Arnold & Porter
                            601 Massachusetts Avenue, N.W.
23                          Washington, DC  20001
                            202-942-5000
24                          stephanie.weirick@arnoldporter.com

25   ALSO PRESENT:          Stuart H. Smith, Esq.
                            Ron Austin, Esq.
```

```
 1              PROCEEDINGS TRANSCRIBED FROM DIGITAL RECORDING

 2                   *************************

 3          THE COURT:  Okay.  Good morning.  This is Judge

 4   Williams.  We are here for a Discovery Dispute Conference in

 5   Steward v. Honeywell.  This is case #18-1124-MJR-SCW.

 6              And, who's on the telephone for the Plaintiffs?

 7              MR. CLAYBORNE:  Good morning, Your Honor.  James

 8   Clayborne on the telephone.

 9              THE COURT:  Okay, Mr. Clayborne.  Anyone else?

10              MR. THOMPSON:  Kevin Thompson and David Barney for

11   the Plaintiffs.

12              THE COURT:  Okay.

13              MR. COBB:  Victor Cobb for the Plaintiffs.

14              THE COURT:  Wait, let me -- Who is -- Evan Thompson?

15              MR. THOMPSON:  Kevin.

16              THE COURT:  Okay.  Mr. Thompson, I don't see you on

17   the list as entered, just FYI.

18              And then, Victor, what was your last name?

19              MR. COBB:  Cobb, C-O-B-B.

20              THE COURT:  I don't see you on here, either.

21              MR. COBB:  I'll get it --

22              THE COURT:  Okay.  Anyone else on for the Plaintiff?

23              MS. CARROLL:  Katrina Carroll.

24              THE COURT:  Katrina Carroll, okay.  You're definitely

25   entered, I can see.
```

```
 1              Anyone else?
 2              MR. SMITH:  Yes, sir.  Stuart Smith.  I am going to
 3    be making an entry of appearance, as well.
 4              THE COURT:  Okay.  Anyone for Defendant?
 5              MR. GALVIN:  Yes, Your Honor.  John Galvin from Fox
 6    Galvin for Honeywell.
 7              THE COURT:  Okay.  Anyone else?
 8              MS. WEIRICK:  Good morning, Your Honor.  This is
 9    Stephanie Weirick from Arnold & Porter on behalf of Honeywell.
10              THE COURT:  Okay.  Anyone else for Honeywell?
11              All right.  Again, anyone for Plaintiffs?
12              Okay.  So, the Court was contacted this morning about
13    a discovery dispute that related to Plaintiff's request for
14    entry onto land.
15              (Brief interruption in proceedings.)
16              THE COURT:  Good morning.  Who's joining the call?
17              MR. AUSTIN:  Good morning.  This is Ron Austin from
18    New Orleans.
19              THE COURT:  I couldn't hear you.  Who was that again?
20              MR. AUSTIN:  Good morning.  This is Ron Austin from
21    New Orleans.
22              THE COURT:  Who are you appearing for, Mr. Hoffman
23    (sic)?
24              MR. AUSTIN:  Austin, like Texas; A-U-S-T-I-N.  For
25    the Plaintiffs.
```

 1          THE COURT:  Can you spell that one more time?

 2          MR. AUSTIN:  Austin, like Texas; A-U-S-T-I-N.

 3          THE COURT:  Okay.  You also don't have an entry of

 4   appearance on file.  There's quite a few for Plaintiffs that

 5   haven't entered your appearance yet, so you need to go ahead

 6   and get -- You're obviously welcome to listen in on the call,

 7   but we need to get some entries in for those who haven't yet.

 8          Okay.  Anyway, back to what we are here for, there

 9   was a request made for entry onto land, and there was a -- I

10   was provided with, at least, I guess, a proposed sampling and

11   testing protocol that I believe the Plaintiffs had proposed,

12   and there's an objection to this.

13          So, let's start with Mr. Galvin.  What's -- What's

14   the issue as you see it?

15          MR. GALVIN:  Yeah, Judge, first of all, thank you

16   very much for making time for us today, and I know on behalf

17   of both of the parties we are really thankful to be able to

18   get in front of you on this issue.

19          The issue is really whether right now there's such an

20   emergency situation the Plaintiffs should be permitted to do

21   an inspection and to circumvent the normal discovery process

22   and, in fact, circumvent Judge Reagan's case management order

23   in this case due to some emergency situation, and we submit

24   that that type of emergency does not exist here.

25          Just a brief overview of the facility --

1          THE COURT:  What case management order are you

2    talking about?

3          MR. GALVIN:  Well, the Judge's -- The initial Uniform

4    Trial Practices and Procedures Order.

5          THE COURT:  Okay.  I entered -- That actually was me

6    who entered that, but go ahead.

7          MR. GALVIN:  Sorry.  Well, I will give you credit for

8    that, Judge.  The significant part of that is it says a party

9    may not seek discovery from another source until the parties

10   made it to initial disclosures, until the parties have met and

11   conferred, and may not seek discovery before the other party

12   has been required to make its initial disclosures.  And not

13   standing on the form over substance here, but it just doesn't

14   seem like the kind of situation which would stir up the rules.

15         A brief overview of the facility down in Metropolis:

16   It's a uranium processing facility, been around since 1960.

17   What it does is it takes raw uranium ore called U308,

18   yellowcake uranium, runs it through a number of different

19   processes to refine it, and eventually it becomes UF6 pellets,

20   that's uranium hexafluoride, and that then is shipped off,

21   other people do things with that, enrich it and such.

22   Eventually it's used in things like nuclear power plants.

23         The real key thing to this issue today, Judge, is

24   that processing is idle right now.  We are not doing that,

25   haven't done it for some time, don't anticipate doing it for

1    some time.   There is a glut in the uranium market, so we have

2    shut down uranium processing for the time being.   The plant is

3    down to about 40 employees versus around 300 when we are

4    on-line.   We expect to get back up on-line in probably 12 to

5    18 months, and not making guarantees about that.   But, the key

6    thing is that the Plaintiffs claim that the source of

7    contamination on the property is air emissions that come out

8    during this process.   That processing is idle right now, so

9    that's part of the reason why there's no emergency that

10   requires us to go outside the normal course here.

11       THE COURT:   Oh, I thought the issue -- Just -- I

12   mean, just so we are on the same page, because it sounds like

13   we are talking about different things, and I neglected to

14   state this at the beginning, what we were also informed of was

15   that allegedly there was construction going on at the plant,

16   and so the request was, *hey, before there's any digging and*

17   *moving of soil* -- I mean, the way I would assume what is being

18   requested -- *is we want to go and dig around and get to the*

19   *soil*, you know, not the -- I mean, it doesn't strike me as the

20   issue being what's coming out of the air right now, but what's

21   in the soil.   I mean, the allegations in the case have more to

22   do with the long-term effects on the soil or long-term effects

23   that might be detected as being present in the soil.

24       So, anyway, that's what I thought we were arguing

25   about, but I could be wrong.   So, I just wanted to let you

1    know, because I am a little confused.

2        MR. GALVIN:  No, I think ultimately that is the

3    issue, Judge.  Let me ask, because I haven't received such

4    communication.  The Court has been provided with something

5    from, I guess, Plaintiffs who talked about there being

6    construction at the plant and a copy of --

7        THE COURT:  No, no.  All I have got -- This is

8    what -- Somebody called my law clerk this morning and said

9    that there's construction going on, and that's it, and they

10   want to enter on the land because of the construction issue.

11   And then I asked that they send us this protocol.  So, that --

12   It does look like they didn't cc. you on that, which should

13   have happened.

14        Ms. Carroll --

15        MS. CARROLL:  I'm so sorry.  I will send it around

16   right now.  I'm so sorry, Judge.  It was an oversight.  I was

17   trying to coordinate a lot of stuff this morning and this

18   call.

19        THE COURT:  Okay.

20        MS. CARROLL:  So, I apologize, and it will not happen

21   again.  It was just -- I had forwarded -- So the Defense has

22   the benefit of knowing -- and I will forward it right now --

23   it was a forward of one of the past e-mails of the one where

24   we attached the protocol, and all I did was forward it to the

25   Court after having had a conversation with Your Honor's law

1    clerk where she just wanted a quick summary of the nature of

2    the dispute.  So, I apologize for that and it will not happen

3    again.

4         THE COURT:  Okay.  So, you guys need to look at the

5    -- at the e-mail that was forwarded to me with the protocol.

6    That's where the confusion, I think, is from your end, Mr.

7    Galvin, which I now -- which I now fully understand.  And, I

8    understand it was an oversight, you know.

9         MS. WEIRICK:  Your Honor, this is --

10        THE COURT:  Go ahead.

11        MS. WEIRICK:  I'm sorry to interrupt.  This is

12   Stephanie Weirick for Honeywell.  And, I appreciate Counsel's

13   apology and statement that it was an oversight, but, you know,

14   for purposes of the record, what I understand was sent you

15   based on Ms. Carroll's description is an incomplete record and

16   is not what provides the status of current negotiations or

17   Honeywell's position.  So, I will just state that you have an

18   incomplete record before you.

19        THE COURT:  Okay.  Well, I certainly didn't expect

20   that this was a complete record, and we don't -- and I'm not

21   intending to rush something that needs more time to address,

22   either.  We are trying to get this resolved expeditiously.

23   And, if we can't get it resolved this morning, then we will

24   take additional time.  It won't be next week, though.

25        MR. CLAYBORNE:  Your Honor, this is James Clayborne.

1  We were advised on June 26th, after we sent them a

2  preservation letter, that construction of a rail spur was

3  taking place, including activities for the demolition of a

4  sulfur hexafluoride building, and for --

5          MR. GALVIN:  And, Your Honor, can I finish my

6  statement?  I mean, we got interrupted because the Plaintiff

7  sent stuff to the Court *ex parte*.  I don't think that means I

8  lose my turn.

9          THE COURT:  Okay.  Hang on.  Have you gotten it yet?

10          MS. WEIRICK:  No.

11          THE COURT:  All right.  This is what we are going to

12  do:  Call back in 15 minutes.  Get the stuff that Plaintiff

13  sent to me, look at it, and I am going to -- and, in fairness,

14  I will start with Mr. Galvin again once he's had a chance to

15  see what I got sent, and everybody will get a turn.  So,

16  actually, I'm going to leave the phone line open, but I am

17  going to hit mute on my end and I'm going to come back in 15

18  minutes.

19          You can either stay on the line while you are waiting

20  to get it or you can hang up and call back in, but the

21  conference line is going to remain connected on my end and I

22  will be back with you at 11:30, okay?

23          MR. GALVIN:  Thank you, Your Honor.

24          THE COURT:  Talk to you then.

25          (Following a recess, conference proceedings

1    continue).

2              THE COURT:  We are back on the record in *Steward v.*

3    *Honeywell*.  We took a break so that Counsel could make sure

4    they had seen the correspondence.

5              I have to correct something.  In this case we haven't

6    entered a scheduling order yet, which was what Mr. Galvin was

7    referring to.  Judge Reagan's case management procedure that

8    he entered is what was being referred to, not my scheduling

9    order, because there isn't one yet.  The parties requested

10   that we extend the time for the scheduling conference, which

11   we did, so there hasn't been a scheduling order entered in the

12   case.

13             In any event, Mr. Galvin, go ahead.

14             MR. GALVIN:  Thank you, Your Honor.  I will go ahead,

15   I'll try to focus on the items that you mentioned that had

16   been communicated to the Court.

17             The way this came up, we had an initial call with

18   Plaintiffs' counsel and we told them, as I have told you, that

19   the portion of the plant, the uranium processing portion, is

20   idle, but there are three things that they should know about

21   that are going on at the plant, and one of those was the

22   remediation of surface impoundments.  We were upfront, we told

23   them about it, we weren't hiding the ball, we said, "These are

24   some things you should know about."

25             THE COURT:  Tell me the -- You said remediation of

1    *what*?

2           MR. GALVIN:  Surface impoundments; ponds, basically.

3           THE COURT:  Remediation of surface ponds?

4           MR. GALVIN:  Of ponds, surface impoundments.

5           THE COURT:  Can you spell the word after *surface*?

6           MR. GALVIN:  I-M-P-O-U-N-D-M-E-N-T-S.

7           THE COURT:  Oh, okay.  Impoundments, thank you.  Got

8    it.

9           MR. GALVIN:  Yeah, impoundments.  And those are used

10   really, to oversimplify it, for calcium chloride waste going

11   into those ponds.  The regulators have asked us to clean those

12   up, get rid of those.  So, the Illinois Environmental

13   Protection Agency, IEPA, has issued a permit under RCRA,

14   R-C-R-A, Part C permit, and we are supposed to get these ponds

15   out of there by the end of 2020.  The site is regulated by

16   IEPA and also by the Nuclear Regulatory Commission.  They

17   defined the procedures at the site, the lease limits, what

18   comes in, what goes out.  It's basically like a nuclear

19   reactor facility in terms of the regulations you get.

20          In order to complete this project to get these ponds

21   or surface impoundments remediated, we need to install a rail

22   spur to take material off the site eventually.  We are grading

23   and moving earth in order to put that rail spur in.  To meet

24   our obligations to the regulators, we need to have the rail

25   spur completed by March of 2019.

1          So, Plaintiffs, in a telephone call we had with them,

2    identified some piles of dirt they were concerned about, what

3    are these piles and what does that have to do with anything.

4    There are some piles of dirt out there, some topsoil from the

5    project, some slag that was brought up, and there's some clean

6    gravel which can be backfilled for that.

7          There are two other things we told them about.  There

8    is also debris from a building that has been demolished that

9    is being taken off site.  This is a building -- It's not part

10   of the uranium processing facility.  It's a different product.

11   It's called sulfur hexafluoride SF6.  I think it's been about

12   ten years since we made that product onsite.  It's not uranium

13   processing, it's not on the radiologic part of the plant.

14   That building has been demolished and there are railcars of

15   debris to be taken away, to be shipped off.

16         And, then, finally there's sort of regular waste that

17   comes out of the plant that also gets shipped off site again.

18   Everything here is regulated; things like used battery, light

19   bulbs, used oil, etcetera, etcetera.

20         And, so we told Plaintiff about these three things;

21   the surface impoundment or pond remediation, the debris from

22   the demolition of this other building, and then the regular

23   waste that goes off.  We told them about those, we provided

24   them with information about these things, we gave them the

25   RCRA permit for the pond project, the rail spur.  We gave them

1    a preconstruction report on the rail spur project that

2    included radiologic testing on the surface there.  We provided

3    them with -- We delayed shipments of waste materials and

4    provided them with lists of the materials in the waste

5    shipments, the analytical testing on those, etcetera.

6    Plaintiffs said at first, "Well, we want to come in and take

7    samples."  So, we said, "What do you want to take samples of?

8    What do you want us to do?"  They said, "Well, we have got

9    photos of these piles of dirt."  "Well, send us those photos,

10   we can make sure we know what you're talking about."

11          We didn't get photos.  In fact, to this day we don't

12   have the photos they promised.  They did send us that testing

13   protocol which they provided to the Court, and when we got

14   that it sets out sort of methodology for testing, but it

15   doesn't say what do you want to test, who's going to come in

16   and this, where do you want to look, what do you want to take

17   samples of.  So, we wrote back.

18          And, Judge, there's -- as you'd expect, there's a

19   response to that letter that the Court doesn't have yet.

20   There's probably three or four more letters between the

21   parties on these issues.  So, what the Court has really is a

22   very incomplete picture.  That testing protocol doesn't answer

23   the very important questions of, "Well, what is it you are

24   coming in to take samples of and, you know, why do you need

25   that?"  Well, we asked for that.  We asked for the photos.  We

1    didn't get those things.

2         And then on a more recent call the Plaintiffs said

3    they wanted to just come in and take a look, and with a

4    follow-up letter they called that a *documentary inspection*.  I

5    was actually confused by that term.  I thought they wanted

6    documents, but apparently they mean they want to document

7    things with photo and video.  I guess -- I'm not sure of this.

8    It seems like they no longer want stick samples, at least at

9    this point in time.  But, we have asked again, "Okay.  What is

10   it you want to document?  What do you want to photograph?

11   What do you want to see?  Why is it important?  We don't have

12   it."

13        So, here we are now, we are at the court to try to

14   get the Court involved to just sort this out so that we can go

15   about our business and so that they can make sure they are not

16   losing something that they need.

17        And, just very briefly, it does go back to the

18   allegations of the complaint.  Because we have these ongoing

19   projects, but that's not what we normally do and that's not

20   the focus of the complaint.  The complaint says the

21   Plaintiff's properties have been contaminated from air

22   emissions from the uranium processing.

23        Uranium processing is not going on.  It doesn't say

24   that they have been contaminated by the topsoil or by the

25   light bulbs we are throwing away or by the building.  It

1  wasn't in the radiologic section.  So, you come up with a

2  question even in a normal circumstance, normal discovery,

3  normal timing, not an emergency, not extraordinary, you still

4  look at, well, is this something that's even relevant to their

5  complaint.

6        THE COURT:  Well, I mean --

7        MR. GALVIN:  If this was construction of the uranium

8  processing facility, that would be one thing.  It's not.

9        THE COURT:  Well, this gets back to -- I mean, the

10  contamination, the fact that they are alleging that it is

11  transmitted through the air, are you saying that, you know,

12  they're telling you the air -- the molecules of uranium that

13  travel through the air and hit their property just kind of

14  bounce off of it?  I mean, presumably if they're saying the

15  property is contaminated, they're saying that the

16  contamination travels through the air and then gets into the

17  soil and stays there, right?

18        MR. GALVIN:  Yes, I think that's right.

19        THE COURT:  Okay.  So, I mean, that gets back to my

20  original understanding is whether it's transmitted through

21  water or air, it's -- or some other material that's being

22  dumped somewhere, I mean, in the end they're saying it is

23  contaminating soil.

24        So, anyway, I'm going to turn it over to the

25  Plaintiffs now, because --

1          MS. WEIRICK:  Your Honor, I'm sorry.  If I could say

2    two brief points, comments.

3          THE COURT:  Who is this?

4          MS. WEIRICK:  This is Stephanie Weirick for

5    Honeywell.

6          THE COURT:  Okay, go ahead.

7          MS. WEIRICK:  I will be very brief.

8          THE COURT:  Go ahead.

9          MS. WEIRICK:  As to your point about any potential or

10   alleged soil contamination that could be revealed as a result

11   of the construction activities that Mr. Galvin just described,

12   Honeywell is obligated and has been conducting analytical

13   testing of soil as the construction activities have gone on.

14   We have informed the Plaintiffs of that and have offered the

15   analytical data and informed them that we are preserving that.

16   We can share those results.

17          The issue with this so-called documentary inspection,

18   as I'm sure the Court can appreciate, this is a nuclear

19   facility that has operated for decades.  We cannot allow

20   members of the public to just come on without having gone

21   through proper safety training, and the Plaintiffs have

22   consistently refused to tell us what it is they want to look

23   at.  There is almost 60 acres of restricted area that cannot

24   be accessed by members of the public.

25          THE COURT:  Yeah, I mean, all of that can be dealt

1    with in the protocol and would need to be.

2            MS. WEIRICK:  Which we have asked them for, to

3    identify the concerns that we have with the protocol that the

4    Court's received, and they never responded to that.

5            THE COURT:  Okay, I understand.  So, the -- Let me

6    just go ahead and let the Plaintiffs respond to these issues,

7    and then I'll have some additional questions, I'm sure.

8            But, who wants to speak for Plaintiffs?  Got to be

9    some lawyer out there that wants to say something.

10            MR. CLAYBORNE:  Yes, Your Honor, James Clayborne.

11            Your Honor, the concern is they are deminimizing the

12    fact that they are sending out this everyday waste and the

13    analytics show there's a significant amount of uranium found

14    in this -- in this everyday waste that they are sending out.

15    Obviously we would like to test inside the plant.  Originally,

16    Your Honor, we were working with them, we extended the time

17    for them to file, and we had a --

18            THE COURT:  For them to file?  What do you mean?

19            MR. CLAYBORNE:  I mean, to respond, to respond to our

20    complaint.

21            THE COURT:  Uh-huh.

22            MR. CLAYBORNE:  And, so we believe that that kind of

23    delayed part of the discovery process.  So, we sent them a

24    preservation letter on 6/22, and that's when they responded to

25    tell us on 6/26 all these activities that were taking place,

 1   and that concerned us.  And we initially talked about

 2   sampling, we call ourselves working things out, and we said we

 3   will just do a site inspection -- I mean, a visual inspection,

 4   and that didn't work out.  So, now, because of this everyday

 5   waste that's going out, the deconditioning of a building and

 6   cleanup, we feel we need to get an expert onsite to do

 7   sampling to prevent spoliation.

 8            THE COURT:  Okay.  So, you don't just want to walk

 9   around and take pictures anymore; you want to go back to --

10   you want to take some sampling?

11            MR. CLAYBORNE:  That's correct.

12            THE COURT:  And, so, the -- Do your -- Is the concern

13   that if you -- that there's sampling you could obtain now that

14   you won't be able to obtain in, let's say, two months time?

15            MR. CLAYBORNE:  That's correct.

16            THE COURT:  So, give me an example.  Tell me what's

17   going to be destroyed or spoliated.  Which, yes, that's a

18   problem if that can happen, and you certainly, you know, have

19   a cause, if that's a real issue, to raise it.

20            So, what is it that's going to get spoliated?  They

21   said that there's an issue -- You know, the three things that

22   were set forth by Defense counsel are starting with the rail

23   spur, that there is some grading and removing of earth.  So,

24   is there a concern?  And, if there is, what is it?  Does it

25   relate to the installing of the rail spur?

1          MR. CLAYBORNE:  Well, Your Honor, not only as it

2   relates to the installing of the rail spur, I mean, you have

3   these big --

4          THE COURT:  So, tell me about the installation of the

5   rail spur that's the problem.

6          MR. CLAYBORNE:  Well, they're turning dirt over, Your

7   Honor.  Their everyday waste has shown a significant amount of

8   uranium in it.

9          THE COURT:  No, I'm talking about the rail spur,

10  still, all right?  You know, there's three things, and I am

11  trying to narrow in on what the problem is as it relates to

12  these three things or are there other things.

13         So, they are installing a rail spur, they are

14  grading, they are removing earth.  Just articulate what's the

15  problem with that that you need to get in there quickly and

16  address.

17         MR. CLAYBORNE:  Well, Your Honor, basically it's a

18  issue of trust.  We are just concerned about how this has

19  progressed and how we tried to work through various issues,

20  and it just raises a red flag.

21         MS. WEIRICK:  Your Honor --

22         THE COURT:  Hang on.  I'm talking to Mr. Clayborne,

23  all right?

24         When you say it's just -- they told you about it, you

25  sent a preservation letter, they told you about it.  So, if

1    it's -- What's the issue of -- If it's just *we don't trust*

2    *them so we need to do it immediately*, you know, if they are

3    disclosing these things to you and if there's a reasonable

4    expectation that things are going to be the same in a period

5    of time, then I'm not seeing -- You know, it's -- You know,

6    I'll give you an example.  We entered an order before the

7    commencement of regular discovery pursuant to Rule 34, which,

8    by the way, does allow for this to happen before -- you know,

9    after the amendment to the Federal Rules, Request for

10   Production -- and this is a cc. of that -- inspection of land

11   can happen before the scheduling conference.  So, that said,

12   we had to deal with this where the issue was crops.  Well, the

13   crops were being harvested, so clearly that's easy.  If you

14   need to inspect the crops and they're in the process of being

15   harvested, it's time to go in and inspect them now.

16          Is there something here that -- You know, it's not

17   enough just to say, "I don't trust people."  You get to go on

18   land, but what's the emergency?  You get to go on land and

19   inspect it.  The rules allow for that.  If it's not an

20   emergency then we can handle it in a more orderly fashion that

21   is addressed by a protocol that sets forth what you're

22   planning on doing and when you are planning on doing it.

23   Which, by the way, that's a legitimate beef on the part of the

24   Defense.  I mean, you can't just say, "We are going to test

25   for stuff, let us in, and we'll let you know when we are

1    done," especially in a nuclear facility.

2            MR. CLAYBORNE:  Well, Your Honor, obviously we are

3    not sure when they are going to ship it off, ship the dirt

4    from the turning -- from the building of the spur, and we'd

5    like to test it.  We are not sure when they're going to --

6            THE COURT:  Okay.  So you know there's dirt that's

7    laying around from the building of the spur, --

8            MR. CLAYBORNE:  Yes.

9            THE COURT:  -- because you have got photographs?

10           MR. CLAYBORNE:  Actually, Your Honor, I have been out

11   to the site.

12           THE COURT:  Okay.  So, who's -- But, apparently you

13   told somebody that, "We have got photographs."  Why can't --

14   And, I mean, is that accurate?  If so, have you given it to

15   them so they can see what you are talking about?

16           MR. CLAYBORNE:  I have not, no.  I have not given

17   them the photos, Your Honor.

18           THE COURT:  You've got them, though, right?

19           MR. CLAYBORNE:  I believe we do have some photos,

20   yes, Your Honor.

21           THE COURT:  Okay.  So, I mean, shouldn't that be -- I

22   mean, that's one of the things you want to take a peek at,

23   right?

24           MR. CLAYBORNE:  Yes.

25           THE COURT:  So, what's the holdup?  Why are you not

1  giving them to them?  Look, you get to go on the land and

2  inspect.  We are going to talk about this.  It is a -- You get

3  to do that, and clearly this is a case that warrants it.  It's

4  just a question of when and how we're going to go about it.

5  But, you know, they've got -- You said, "Hey, we took pictures

6  of piles of dirt and we are concerned about that."  Well, you

7  need to send them the pictures of the piles of dirt.

8          MR. CLAYBORNE:  Okay.  And the other issue, too, Your

9  Honor, our experts want to chapel and show the degree of

10  contamination --

11          THE COURT:  Yeah.

12          MR. CLAYBORNE:  -- with the proximity to the plant.

13          THE COURT:  Yeah, that makes sense.  Now, and to me,

14  I mean, that's going to be true whether or not there's

15  anything being done there.  The issue of construction is a --

16  obviously implicates how quickly do we need to get this done.

17  So, is there -- Let me ask the Defense, while we are still on

18  the issue of the rail spur, is there earth being removed from

19  the site?

20          MR. GALVIN:  Your Honor, my understanding is there's

21  not earth being removed right now, but there's earth that has

22  been moved, but there are things that we would in due course

23  want to ship off the site.  I will point out that even the

24  ponds themselves are only about three or four acres out of

25  1,100 acres.  The rail spur is smaller than that, as you can

1    imagine.

2            THE COURT:  Yeah.

3            MR. GALVIN:  So, if they want to test dirt at some

4    point during this case in the ordinary course, there's plenty

5    of dirt to be tested.  We have provided them the testing on

6    this particular dirt.  We have already provided the analytical

7    data on this dirt to them.

8            THE COURT:  Well, look.  They get to do their own

9    testing.  I mean, this is -- They don't have to rely on the

10   Defendant's testing of its own soil.  So, I am just throwing

11   that out there.

12           To your other point, though, that here's a little bit

13   of dirt being moved around and we have got lots of dirt to

14   test, that's a fair point, because it goes directly to how

15   quickly does this need to get done.  So, I hear you on that.

16           What about -- And, so, the other issue is the debris

17   from the building being taken off site.  Yes, this building

18   was a site for production of sulfur hexafluoride, as opposed

19   to uranium hexafluoride, if I've got that right.

20   Nevertheless, it sounds like Plaintiffs are concerned that the

21   building which was not the site of the production of the

22   uranium hexafluoride is nevertheless contaminated by that

23   production.  And certainly, you know, that seems like that

24   would be a relevant fact if, in fact, it's true as it relates

25   to their case.  And I don't know, you know, how far away that

1    building is from the building where there are buildings that

2    are producing the uranium hexafluoride and if it's uphill,

3    downhill, upwind, downwind, downstream, upstream, but -- all

4    that stuff.  And, I'm not a scientist.  This is all just stuff

5    that occurs to me that that could be relevant is that is the

6    debris being taken off site from this building that's been

7    demolished?

8            MR. GALVIN:  Yes, Your Honor, we are supposed to take

9    that material off site.  We have got a couple of shipments

10   that are ready to go and then a couple of more shipments that

11   will be prepared.  So, we do want to move those materials

12   pursuant to instructions from the regulators.

13           THE COURT:  Yeah, and to -- Mr. Clayborne, did you --

14   I thought you said or somebody said that you believe that

15   there is -- that that building, though, despite its -- what it

16   was being used for would contain evidence of contamination.

17   Is that right?

18           If someone else wants to jump in other than Mr.

19   Clayborne on this, that's fine.

20           MS. CARROLL:  Your Honor, it's Katrina Carroll, and I

21   think that is absolutely correct.  You know, we are generally

22   interested in the area, because I think as the Court pointed

23   out a little earlier, one of the important issues here is that

24   this material is airborne.  And even though, you know, it's

25   airborne and in the soil, it doesn't mean that it can't be in

1    other places.  So, critically one of the important issues that

2    we are going to have to show is causation, and it's important

3    for us to know what concentration of, you know, these toxic

4    chemicals exist and in what proximity to the plant, which is

5    where they were emitted.  So, for that reason we are, you

6    know, acutely interested in getting out to the site and doing

7    some -- You know, either we impose a visual inspection at

8    first, because to us, you know, this process has been going

9    on -- this meet-and-confer process has been going on for over

10   a month with them.

11           THE COURT:  I know.  We are getting -- Look, we are

12   not starting from scratch here.

13           MS. CARROLL:  And I don't want to waste the Court's

14   time, but that is why we are absolutely interested in the

15   sulfur hexafluoride properties.

16           THE COURT:  All right.  So, what is it -- Like give

17   me -- What's a contaminant that came from somewhere else that

18   you're alleging is in the property of the Plaintiffs that you

19   think could be in the building that was producing the sulfur

20   hexafluoride?

21           MS. CARROLL:  Well, uranium, Your Honor.

22           THE COURT:  Okay.

23           MS. CARROLL:  Uranium was emitted in close proximity,

24   and that's the major chemical that we are concerned with, but

25   there's other toxic substances, as well, that we found in our

1    own testing of the Plaintiffs' property.

2            THE COURT:  Okay.

3            MS. CARROLL:  But uranium is obviously the number

4    one.

5            THE COURT:  And, so, they find it in the soil, and

6    where else do you find it on Plaintiff's property are you

7    saying?

8            MS. CARROLL:  One example is we found it in someone's

9    attic.

10           THE COURT:  Someone's *what*?

11           MS. CARROLL:  The attic.  The attic of their home,

12    Your Honor.

13           THE COURT:  Is it like you just are testing the

14    ambient air or are you finding it embedded in something else?

15    I don't know how that works.

16           MS. CARROLL:  You know, I was going to say we tested

17    dust, the dust in peoples' homes, is one example.  And attic

18    dust is typically a good indicator, because people don't clean

19    their attics that often, so it's a good indicator of what --

20           THE COURT:  Did you say -- Hang on.  I got you all on

21    speaker.  Occasionally I can't hear you completely.

22           Did you say -- You said *dust*.  I thought I heard you

23    say *ducts*.  But, you said dust?

24           MS. CARROLL:  No, dust.  D-U-S-T, Your Honor.

25           THE COURT:  Okay; all right.  So, in other words,

1   there's uranium that gets in the dust in peoples' houses and

2   it just sits there.  And it's in their attic -- It's in their

3   attic, because you can find it in the dust in the attic?

4          MS. CARROLL:  Yes.  And that's not limited to

5   uranium.  Uranium is the number one, but there's also, you

6   know, thorium, plutonium, you know, a host of bad stuff.

7          THE COURT:  Okay.  So, in other words, the level of

8   concern -- So, when was this building where the sulfur

9   hexafluoride was being produced -- When was that torn down,

10  Mr. Galvin?

11         MR. GALVIN:  I'm not sure the exact date, Your Honor,

12  but it's fairly recently, because the debris is being taken

13  away now.

14         THE COURT:  Okay.  So, you know, this is a fair

15  point.  They're saying, "Look, the same things that we found

16  in the attic we would expect to be finding probably in a

17  higher concentration in the building next door that's on the

18  same site.  It's rubble, but that's a whole bunch of dust that

19  we can test just like peoples' attics." That makes sense to

20  me.  And if it's being trucked off the facility we've got to

21  get that testing done before it's gone.  And, they probably

22  ought not be taking anymore offsite, because that would be

23  considered spoliation.  So, you know, the question is how

24  quickly does this need to get done so that you're not hampered

25  in your efforts to do the remediation that you have been

1   ordered to do and they are not losing out on evidence that's

2   readily available to them at this point in time.

3          So, back to, you know, the Defense, this -- I mean,

4   there does seem to be a timeliness issue.  I understand and

5   appreciate and accept your arguments about having a protocol,

6   understanding who, what, where, and when.  There sure to be

7   some flexibility, but it does need to be detailed and safety

8   precautions need to be taken into account.  The general public

9   is not allowed in, but we are not talking about the general

10  public.  We are talking about experts and limited individuals

11  who would be coming in for a specific purpose that's relevant

12  to collection of evidence in the case.

13         My proposal, Mr. Galvin, is that you all meet and

14  confer further and nail down these additional details about

15  the who, what, where, and when on the facility.  We know

16  generally the where and we know a little bit about what,

17  because we know what they want to test for, but that's it.

18  You're right, we need to learn these other things and we need

19  to do it before you truck any more of the material off site.

20         MR. GALVIN:  Well, we have held off on moving things

21  off site, Your Honor, and part of the reason -- And,

22  Plaintiffs agreed with this.  I don't mean it's just our idea.

23  But, we are happy to come to the Court to get clarification on

24  this, because, as you said, we are under duties with the

25  regulatory agencies, so we can't just, you know, hold this

1    stuff forever.  We need to get it sorted out.

2          THE COURT:  Yeah.

3          MR. GALVIN:  As I said understand it, Judge, because

4    it's been a bit of a moving target here, we are sampling and

5    there's just photographs, and I think now we are now back to

6    the Plaintiffs are actually going to do sampling, --

7          THE COURT:  Yeah.

8          MR. GALVIN:  -- and that's going to be at the rail

9    spur project and the debris from the SF6 building?

10         THE COURT:  Well, but it doesn't make sense to limit

11   it to that at this point.  We don't want to do multiple visits

12   onto the property.  Those are the ones that -- I'll be honest

13   with you.  From what I am hearing I don't know how pressing

14   the whole rail spur issue is, because, as you say, it's not --

15   it's not a tremendous amount of earth that we are talking

16   about, given that we are talking about a rail spur.  I mean,

17   it's just on a large facility.  It's not.  But, it doesn't

18   make sense to have, "Well, the building's about to get trucked

19   out of there, so you can come in and take those samples and

20   then we'll talk later about samples of other points," I mean,

21   if we have to do it that way.  But, that'S clearly the one

22   that's timely.  I think you all need to discuss and Plaintiffs

23   need to articulate and it probably would be useful if you had,

24   you know, a map and there's some flexibility when they get on

25   there, you CAN have some parameters about the general

1    locations of where the testing would be done, the number of

2    samples or a range of samples that can be tested.  And why not

3    get it all done in one fell swoop?  That's what makes the most

4    sense.  The thing that makes this a pressing issue is the

5    building that's being -- that's been demolished and is being

6    trucked off site.  It's clear to the Court that needs to be

7    tested before anything else is moved.

8          So, why don't the parties get together further,

9    establish a protocol for the who, what, where, when.  There

10   shouldn't be any earth moved off of that premises until this

11   occurs, this testing occurs, and the sooner we get it done the

12   better.  And I'll take suggestions as to how long you all want

13   to talk about this for, and if you can't reach a resolution

14   and it gets down to some minutia, I'm happy to talk with you

15   all again.  And, if you would like, I can just go ahead and

16   set like a follow-up conference with you all.  I could do it,

17   for example, any time -- well, not any time -- but during like

18   the week of August 6, you know, so that will give you a week

19   and a half to two weeks to work all of this out with an eye

20   towards getting it done by mid August.

21         MR. GALVIN:  Your Honor, this is John Galvin.  Thank

22   you for the guidance.  I think it does make sense to put

23   something on calendar, although I would hope that we can work

24   out whatever we need, you know, just voluntarily without your

25   involvement again, and I would hope we could do it even before

1        that week.

2                 THE COURT:  Okay.

3                 MR. GALVIN:  One issue, though; one question.  The

4        parties have been focused on the exigent circumstances and the

5        things that, you know, are being changed or are being moved,

6        and so we have talked about it in terms of the rail spur and

7        the debris, as we've discussed in the call here today.  You

8        know, if we broaden this and this is going to be Plaintiffs,

9        you know, one and only inspection and testing and sampling of

10       everything in the entire plant -- and I'm not sure if that's

11       what the Court is suggesting.  But, if it's going to be the be

12       all and end all inspection, that complicates things, changes

13       things significantly --

14                THE COURT:  Okay.

15                MR. GALVIN:  -- and, you know, makes it a lot bigger.

16       And we do have -- We have a *Motion to Dismiss* we are going to

17       file that's going to resolve maybe the whole case, maybe some

18       of the issues in the case, things will get narrowed.  You

19       know, I don't know if --

20                THE COURT:  I see.

21                MR. GALVIN:  -- this has to go there yet.

22                THE COURT:  Yeah, that's a fair point.  And, you

23       know, it's easy for me to just say, "Why not take care of all

24       of it," when, well, there's good reason not to, because that's

25       a mammoth undertaking, and what we are really concerned here

1  is about things that might be altered and let's take care of

2  that first.

3        Let me get Plaintiffs' thought on this.  I mean, this

4  can be a slight -- You know, we can maybe take care of those

5  things you are most concerned about now with the understanding

6  that you can discuss other issues of testing later so that

7  there's not unnecessary burdens that are put in place too

8  quickly.

9        Ms. Carroll?

10        MS. CARROLL:  Your Honor, I think we would be

11  amenable to that and actually would prefer that, as well.

12        THE COURT:  Okay, great.  So, that's all I needed to

13  hear.  With that in mind, I'm going to retract that statement

14  I had made we will get it all done now, because that was --

15  that doesn't make sense here.  It's clear both sides agree on

16  that.

17        So, you know, come up with a protocol that resolves

18  the issues that you are facing now and let's talk about

19  checking in, if necessary.  And, let me throw out some dates

20  and times.  For example, we could talk on August 8th at 11:00

21  a.m.

22        MS. WEIRICK:  Your Honor, can we push it back to

23  Thursday?  This is Stephanie Weirick.  I'm sorry, that day is

24  difficult for me.

25        THE COURT:  Sure.  Yes, we can.  We are a little

1    busier that day.

2            How about late afternoon, 4:15 p.m.?  Thursday, the

3    9th, 4:15 p.m.?

4            MS. CARROLL:  That works for me.

5            THE COURT:  Okay.  Anyone it doesn't work for?

6            MR. GALVIN:  Judge, one more quick question.

7            THE COURT:  Sure.

8            MR. GALVIN:  Yeah, I'm sorry.  This is John Galvin

9    again.  The parties also talked about a protective order that

10   would govern the process and the materials that are the result

11   of this.  If we agree to that, we just submit it to you just,

12   I mean, via e-mail as a proposed order?

13           THE COURT:  Yeah.

14           MR. GALVIN:  Does it go to Judge Reagan?  How does

15   that work?

16           THE COURT:  Submit it to my proposed orders inbox and

17   call Amber and let her know that you sent it, and then we will

18   take a look at it and get it entered.  If there's any issues

19   with it, you know, we can talk about it on the 9th.

20           MR. GALVIN:  Okay.  Thank you, Judge.

21           THE COURT:  Okay, great.  Thank you, everyone.  Talk

22   to you soon.

23           (Court is adjourned)

24

25

1                              * * * * *

2                            CERTIFICATE

3          I certify that the foregoing is a correct transcript

4    from the digital recording of proceedings in the

5    above-entitled matter to the best of my ability using a

6    digital recording system.

7

8    */s/ STEPHANIE RENNEGARBE*                    *07-31-2018*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25