1                IN THE DISTRICT OF THE UNITED STATES OF AMERICA
                    FOR THE SOUTHERN DISTRICT OF ILLINOIS
2   _____
                                     )
3   **ROGER STEWARD, SAUNDRA**       )
    **STEWARD, VERNA WELCH, SAVANNAH** )
4   **WELCH, WANDA SULLIVAN AND JOHN** )
    **SULLIVAN; on behalf of**        )
5   **themselves individually and all** )
    **others similarly situated,**    )
6                                     )
                    Plaintiff(s),     )
7                                     )
8       vs.                           )   Case **18-CV-1124**
                                      )
    **HONEYWELL INTERNATIONAL INC.,**  )
9                                     )
                    Defendant(s).     )
10  _____)

11                         **DISCOVERY DISPUTE**
12                       (Telephonic conference)

13
      BE IT REMEMBERED AND CERTIFIED that heretofore on  **8/9/2018**,
14   the same being one of the regular judicial days in and for the
      United States District Court for the Southern District of
15      Illinois, **Honorable Stephen C. Williams**, United States
      Magistrate Judge, presiding, the following proceedings were
16    recorded by mechanical stenography; transcript produced by
                                computer.

17

18                            **APPEARANCES:**

19  *FOR PLAINTIFF(s):* **Katrina Carroll** and **Kevin Thompson** of Lite
    DePalma Greenberg, LLC-Chicago, 110 W. Washington Street -
20  Suite 1240, Chicago, IL 60602

21  *FOR DEFENDANT*: **John E. Galvin** of Fox Galvin LLC, One South
    Memorial Drive, 12th Floor, St. Louis, MO 63102 **and**
22  **Michael Daneker and Stephanie Weirick** of Arnold & Porter -
    Washington, DC, 601 Massachusetts Avenue, N.W, Washington, DC
23  20001

24  *REPORTED BY*: **Molly N. Clayton, RPR, FCRR**, Official Reporter
    for United States District Court, SDIL, 750 Missouri Ave., East
25  St. Louis, Illinois 62201, (618)482-9226,
                      *molly_clayton@ilsd.uscourts.gov*

1

**INDEX OF WITNESS EXAMINATION**

2

| | **DX** | **CX** | **R-DX** | **R-CX** |
|---|---|---|---|---|

3

No witness testimony.

4

5

6

7

**INDEX OF EXHIBITS**

8

| **EXHIBIT** | **DESCRIPTION** | **Id'D** | **Rcv'd** |
|---|---|---|---|

9

Exhibits not indexed.

10

11

12

13

**MISCELLANEOUS INDEX**

14

**PAGE**

15

No miscellaneous index entries.

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Okay, we are on the record in *Steward*

2  *versus Honeywell*, Case 18-1124-MJR-SCW.

3          On the line for plaintiffs are Kevin Thompson and

4  Katrina Carroll.  And for defendant Honeywell:  Michael

5  Daneker, John Galvin, and Stephanie Weirick.

6          So when we last talked we discussed the parties

7  getting together for a protocol to address areas where there

8  was concern about spoliation for purposes of doing testing.

9  And we did, in fact, specifically talk about whether or not

10  this would be all the testing or just areas that were of

11  specific concern, with the understanding that there would be an

12  opportunity down the road for additional testing.  So the

13  parties have met and conferred and evidently there are some

14  issues concerning the location of testing that the plaintiffs

15  want to do.

16          So I'll let defense start.  And whoever is going to do

17  that.

18          MR. GALVIN:  Thank you, your Honor.  John Galvin

19  here.  And I won't take too long.

20          But you will recall this episode started as we had

21  disclosed to plaintiff some ongoing work that was happening at

22  the facility.  And when we had our prior call with the Court, I

23  think, Judge, you focused on absolutely the right question.

24  You asked the plaintiffs at Page 19 of the transcript:  Is it

25  the concern that there's sampling you could obtain now that you

1  won't be able to obtain in, let's say, two months time.

2          And you went on to ask them:  So give me an example.

3  Tell me what's going to be destroyed or spoliated.

4          So, Judge, that's the focus, and should be the focus.

5  And the plaintiffs are asking for pretty extraordinary relief

6  here; the opportunity to come on to the site and do testing in

7  advance of normal discovery, in advance of even a ruling on our

8  motion to dismiss which has now been filed.  And, you know,

9  eventually the pleadings get set.  We find out what is relevant

10  in the case.  They want to come in earlier.  So the focus needs

11  to be on:  Is there an emergency?  Is there, as you asked the

12  plaintiffs, something you need to take now that you couldn't

13  get later on?  Is there something that's going to be destroyed?

14          As we talked, the focus ended up on being the SF6

15  building.  In great part because you had asked me, Judge, on

16  the rail spur project when we moved some dirt were we going to

17  be moving that offsite, and we didn't have plans to move that

18  offsite.  We would in due course, but not right now.  And in

19  the Court's minute order, it said don't move any earth off

20  right now.  And so we focused on the SF6 building.  And, Judge,

21  even in the transcript again, at Pages 30 and 31, you said:

22  The building, that's the one that's timely.

23          You said:  The thing that makes this a pressing issue

24  is the building that's being demolished and is being trucked

25  offsite.

1          So when we followed up a week or so after the hearing.

2     We hadn't heard anything from plaintiffs, so I wrote and said,

3     you know, are you guys still interested in coming in and doing

4     this testing.  And they did get back to us then with their

5     protocol which really included these Google Earth images, not

6     really photographs of the site but images they pulled off the

7     Internet, that had circles and boxes around some areas.  We

8     were surprised to see that none of those included the SF6

9     building debris.  Which was the exact thing that we said we

10    need to ship this offsite because it is costing us money

11    everyday, was the focus of the hearing.  It was the thing that

12    you focused on, Judge.  Instead, we got these satellite images

13    of areas that have nothing to do with anything we talked about

14    and are not in any kind of imminent threat of being spoliated

15    or destroyed.

16          For example, one of the photographs is of our office

17    building, our administrative building.  And the plaintiffs now

18    tell us they want to come in and test the inside of that

19    building.  That building is not being moved offsite.  It has

20    really nothing to do with this emergency procedure that we're

21    talking about here.  For general discovery, down the road, we

22    can talk about those kind of things.  But right now it has to

23    be an exigent circumstance, irreparable harm really kind of

24    shows me the plaintiffs probably are not really interested in

25    testing the SF6 debris.  I thought in the first place that that

1    was kind of a red herring.  Their case is really about whether

2    there is contamination on their own property, not whether there

3    is contamination on the facility.  It's a uranium processing

4    facility, there is going to be radioactive material on that

5    facility.  We know that; the government now knows that.

6          We have now had 30 days of costs running on this.  And

7    frankly, Judge, we are at the point we would ask that you allow

8    us to move on, do our business, move the stuff offsite that

9    needs to be moved offsite.  If, some day, if this case survives

10   the motion to dismiss, and if, some day, they actually file a

11   proper request for inspection of property and show that this is

12   permissible discovery, then, some day, they can come in and

13   might be able to test the inside of the building, or a pad over

14   here, or a road, which are the things they've identified now.

15   But that's not what we talked about at the last hearing; that

16   was not the focus of what you were told, your Honor; and that's

17   not an appropriate thing to try to do on this request for early

18   discovery.

19          *THE COURT:*  Okay.  So who's speaking for the

20   plaintiff?

21          *MS. CARROLL:*  Katrina Carroll, your Honor.

22          *THE COURT:*  Okay.  Yeah, I know what we talked about.

23   I even offered up you guys coming up with a protocol to test

24   the entire site so we didn't have to do it more than once and

25   everybody agreed, no, there was no necessity for that; we just

1  need to take care of the stuff that there's a concern about

2  spoliation.  And, evidently, you are not even asking to test

3  the debris that's being trucked off that I told them they

4  couldn't move.

5        MS. CARROLL:  Let me just respond to that, your

6  Honor.

7        THE COURT:  Yes, please do.

8        MS. CARROLL:  When we had the discussion on the

9  record, my understanding is that we were focused on the SF6

10  area, but that we were not going to be limited to the debris

11  only and --

12        THE COURT:  So why is it that you didn't even ask to

13  test that building?

14        MS. CARROLL:  Because, your Honor, after I was able

15  to consult with my expert after we had the hearing, I said,

16  well, you know, what is the concerns in the area from the

17  construction activities.  And we know the debris is admittedly

18  contaminated with the uranium because they've produced

19  documents establishing that.  The concern that the expert

20  relayed to me was that moving that debris, which is admittedly

21  contaminated, around the area would likely interfere with

22  future test results that we would get, and thus affect our

23  ability to show the concentration of the toxic materials in the

24  area.  Which is, I think, what we discussed on the hearing as

25  well.  So --

1          THE COURT:  No, I don't -- can you tell me where in

2     the transcript.

3          MS. CARROLL:  I believe --

4          THE COURT:  -- that that was?

5          MS. CARROLL:  I believe it was at Page 19, your

6     Honor.

7          THE COURT:  Let me look at it --

8          MS. CARROLL:  Now --

9          THE COURT:  Let me look at it.  I don't remember that

10    piece.

11         MS. CARROLL:  It's around 19, your Honor.  I'm

12    scrolling through it right now.  Oh, here -- I think we started

13    at the bottom of 25 -- 25, Line 20 -- and then the top of 26.

14         UNIDENTIFIED SPEAKER:  It's not related to the

15    building.  You got to look at Line 15 there.  The Court's

16    asking about the building.

17         COURT REPORTER:  Who is that?

18         THE COURT:  Oh, that's Mr. Galvin is who that was.

19         MR. GALVIN:  Oh, I'm sorry.

20         THE COURT:  Hang on.

21         On Page 25?  I'm now on to Page 27, I'm not sure I see

22    where you are talking about.

23         MS. CARROLL:  I was trying to make the point that the

24    area in proximity to the building, where the building was, is

25    an important area in general because it's important to show,

1    for purposes of our case, causation, and how the materials are

2    concentrated, where they're concentrated, and where they're

3    most concentrated.

4          THE COURT:  Okay.  So you just want to test the area

5    right around the building?

6          MS. CARROLL:  Well, we proposed four areas that our

7    expert said would give us the best sense.  And the areas that

8    we chose, most of them are outdoor areas that would not be

9    disruptive of any of Honeywell's operations.  And the one

10   indoor area was chosen based on what my expert told me because

11   it is in proximity to where the plant processes were.

12         THE COURT:  You didn't answer my question.  Because

13   obviously for me -- for you to say our expert chose these areas

14   because these are the areas he wants to test.  Fine.  But what

15   we are trying to understand is, if I'm going to give you two

16   bites at the apple, you only get those if the first bite is the

17   emergency bite.  And it sounds like you want the first bite to

18   be the big bite, and the second bite to be the clean up bite.

19   So that's not how -- and I already told you I thought that's

20   how we were going to do, just one bite.  And you said, no, we

21   don't want that, we want two bites.  But you only get two if

22   the first one is an emergency.

23         MS. CARROLL:  Well --

24         THE COURT:  If this --

25         MS. CARROLL:  I --

1          THE COURT:  I don't want to know just why it is that
2     your expert thinks these are good sites to test.  And if that's
3     what you want to do, we can do it in the ordinary course.  You
4     can file a request to produce, like the defense says.  And
5     actually you can do that before the scheduling conference,
6     that's allowed now under Rule 34.  And you do one testing of
7     the whole site.
8          But I wanted to know why, now that you are not going
9     to test that building, and presumably what you -- you haven't
10    told me that these are right in the immediate vicinity of that.
11    And I'm concerned about that.  You are saying these are the
12    places my expert thinks we should test.  And that --
13          MS. CARROLL:  Well, --
14          THE COURT:  -- goes to what your expert says
15    substantively about the entire case.
16          MS. CARROLL:  Your Honor, what my expert has told me
17    is what he is -- the biggest concern, and this is the
18    emergency, and if we are wrong about the area then I'm happy to
19    meet-and-confer further with defense on it.  But his biggest
20    concern is that admittedly contaminated material from that
21    building is being shipped off.  And so in order for that to
22    happen, it needs to move through the property.  And --
23          THE COURT:  Okay.  So you want to test the areas that
24    the admittedly contaminated --  you don't, like, pick up the
25    contaminated stuff, I don't think, and spread it around the

```
 1    property like you are shoveling snow.  It's being moved

 2    offsite.  So there's, like, a road, right?

 3              MR. GALVIN:  Your Honor --

 4              THE COURT:  So he wants to test the roads but before,

 5    just to make sure that, you know, the -- if we test the roads

 6    later it's not an increased amount on the roads because there

 7    was debris being dropped?

 8              MS. CARROLL:  He didn't say anything to me about

 9    roads.  And I don't know how, you know, in terms of logistics,

10    what happened and how it moves.

11              THE COURT:  You know, you got to kind of explain that

12    to me if you want to get in there on an emergency for bite

13    No. 1.  And then instead of we get two bites of the apple,

14    let's take our best shot now, and then we will get another one

15    because we already secured that assurance for the other side

16    and the Court.  That seems like a bait and switch.

17              If you are saying these are the places our expert

18    wants to inspect, and we want to inspect all these places

19    before anything is disturbed, okay.  Then let's have an honest

20    discussion about that.  And, you know, if it's six sites, then

21    you go in and get your six sites and we're done, and you don't

22    get to go back in.

23              Is that -- I mean, is your expert saying there is

24    other places he wants to go?

25              MS. CARROLL:  We asked him for a narrow proposal.
```

1    I'm assuming if it was going to be a one-shot deal it would be

2    a lot more expanded.

3        THE COURT:  Okay.  But then what is this -- so this

4    narrow proposal is give me six that are narrow and then we will

5    go in later if -- but what does it have to do with specifically

6    the activities that are taking place as it relates to those six

7    specific locations that he proposed?

8        MS. CARROLL:  He's --

9        THE COURT:  That was clearly the focus of our

10   discussion last time is what's going to get spoliated and why.

11   And you explained to me a good reason, but it's a different one

12   than I'm hearing right now.

13       MS. CARROLL:  Well, I apologize for that, your Honor.

14   But the reason it's a different one is because I had a chance

15   to talk to my expert more.  He's the one with the scientific

16   knowledge.  But my understanding is, you know -- my goal is

17   still to, you know, try to make this as narrowly tailored as

18   possible, and to try to focus on the area around the building

19   where the admittedly contaminated waste is going to be moved

20   from.

21       THE COURT:  Okay.  So are these places on the Google

22   Maps then -- let me see...

23       MS. CARROLL:  The Area 1 of the Google Maps -- your

24   Honor, I'm sorry to cut you off -- is the dirt piles that we

25   referred to in several meet-and-confers with defense.  And I

1  think Mr. Galvin made a reference to it on our last call.  It's

2  the -- there's a soil pile there that we had identified.

3        THE COURT:  Okay.  So that --

4        MS. CARROLL:  We don't know --

5        THE COURT:  Is that dirt pile the -- having to do with

6  the tracks that are -- the railroad tracks?

7        MR. DANEKER:  Our understanding is that that is a

8  dirt or slag pile that has to do with the grading for the

9  railroad tracks; and we have said we will not move offsite

10 pending further -- pursuant to the Court's minute order.

11       THE COURT:  Okay, so that's 1.

12       So I mean, all right, that was an area we did talk

13 about because there is a dirt pile there now that was clearly

14 earth that was moved from somewhere else.  But that doesn't

15 having anything to do with the building, does it?  That had to

16 do with a very small area where there was grading being done.

17       MR. DANEKER:  That's correct.

18       MR. GALVIN:  None of these have anything to do with

19 the building.  And I'm sorry that -- Counsel says that her

20 expert tells them they wanted to sample in the area immediately

21 in proximity to the debris from the SF6 building.  They don't

22 even have that area circled or squared on any of these maps --

23       THE COURT:  Well, do I have --

24       MR. GALVIN:  -- we are not taking the debris through

25 the administrative offices.  That's one of the places that they

1   have circled.  That's not at all what these pictures depict.

2   Plus that --

3       THE COURT:  Yeah.

4       MR. GALVIN:  -- those things are not getting changed.

5   Okay.  What's getting changed is, the debris is being moved

6   offsite.  If they have an emergency they need to test, it is

7   the debris that is getting moved offsite.  Nothing else.

8       MS. CARROLL:  Well, our view is the pathways of that

9   debris are highly relevant.

10      THE COURT:  I'm sorry --

11      MR. GALVIN:  They're not going through the office.

12      THE COURT:  Okay.  So, your -- the pathways for the

13  debris, is that -- all right, so, I'm looking at "compare

14  results" that's got these pictures on it.  (Law clerk speaking

15  with judge).

16      I'm going to look at Plaintiff's Proposed -- I'm going

17  to use that one instead, Plaintiffs' Proposed Protocol.

18      MR. DANEKER:  If you look at Plaintiffs' Proposed

19  Protocol my understanding is that the SF6 building, look at the

20  aerial photograph that has Squares 4A and 4B on it.

21      THE COURT:  Okay.

22      MR. DANEKER:  Neither 4A nor 4B contains the SF6

23  building.  Our understanding is that the SF6 building and

24  demolition is -- there no direction here, but -- down the page,

25  due south of 4B, a little bit to the southwest of 4B.  And

1  what's going on is that the building is being demolished.

2  There are piles of debris that are being created there, and

3  those piles are loaded on to rail cars there, and then the rail

4  cars have to be screened before they can leave the restricted

5  area so they are demonstrated to be sealed.  Which means that

6  the loading operations, and any transport, would be right in

7  the vicinity of those debris piles.  Which is why we suggested

8  to them that they sample the debris piles adjacent to the SF6

9  demolition.

10      *THE COURT:*  So what's the -- I mean, I'm just not

11  seeing how -- what the connection is between the areas that you

12  have indicated on here then, Ms. Carroll, and what you have

13  just said to me.  So let's start with -- I'm looking at your

14  Exhibit 1 figures:  Areas to be sampled, Area 1, surface soils

15  and sediments from storage area.  What's that?

16      *MS. CARROLL:*  That's the soil pile that we've been

17  continually talking about.  And based on what I just heard, it

18  appears that that's rails for dirt.  You know, it's their -- is

19  there an exigent circumstance?  I don't think I can tell your

20  Honor there is an exigent circumstance for sampling that right

21  now.  We included it because it was a specific area that we

22  noted.  And, you know, if we are going on site we might as well

23  do it now.

24      *THE COURT:*  Well, we talked about that before, didn't

25  we?  If we are going on site we migh's well do it.  If you want

1  to just do one overall trip to the site then, you know, the

2  migh's-well-do-it-now part is fine if we are going to do it all

3  now.  What about Areas 3A -- let's see.  This one is Area 2,

4  Surface Soils and Sediment.  What's that?

5          MS. CARROLL:  Area 2 is an outdoor area that I think

6  is to the south of the site.  It's -- there's a -- if you look

7  at Aerial Picture 1 there is, in the lower left-hand corner,

8  there's like a green, it looks like a pond area.  Area 2 is the

9  outdoor area that is near there, blown up.

10          THE COURT:  I see it.

11          (Law clerk speaking to Judge)

12          Yeah.  I'm looking at the picture.  What's the

13  significance of that that's exigent?

14          MS. CARROLL:  My expert's general concern that

15  movement of hazardous material, materials that are radioactive

16  are being moved through the area generally.  Do I have a -- I

17  don't have a specific exigent circumstances as it relates to

18  that area other than that general concern my expert relates.

19          THE COURT:  Okay.  What about --

20          MR. THOMPSON:  Well, your Honor --

21          THE COURT:  Go ahead.

22          MR. THOMPSON:  -- if the defendants --

23          THE COURT:  Who is this?

24          MR. THOMPSON:  Kevin.

25          -- are fine with us doing one sample, like, one big

1    trip, we could just do one big trip and just do it a little

2    sooner than everyone had planned on doing it.

3            UNIDENTIFIED SPEAKER:  When you say a little bit

4    sooner.  I mean, in the ordinary course of discovery, when we

5    have had a ruling on the motions, the pleadings are set so we

6    know the scope of discovery.

7            MS. CARROLL:  Well, I --

8            UNIDENTIFIED SPEAKER:  Rule 26 conference.  That's

9    when you do an inspection.  If this is an emergency, it's an

10   emergency.

11           THE COURT:  I'm talking about what is -- I'm trying to

12   understand and get -- have something explained to me about why

13   these things are an emergency versus anything else.

14           So if I've told them not to move debris and -- I'm

15   still not -- these explanations of "our expert thinks so"

16   doesn't tell me anything.  And the same thing I guess with 3A

17   and 3B.  I mean, going to be.

18           UNIDENTIFIED SPEAKER:  This could be the solution.

19   Our expert doesn't have access to the site, but he's guessing

20   where we might find debris if it's been moved about the site.

21   Maybe we could just test the pile of stuff that the debris for

22   the building.  And then maybe the defendants could show us

23   where that debris moved from and to, and we take four soil

24   samples along the path that they tell us.

25           THE COURT:  Well, that sounds reasonable.

1      *UNIDENTIFIED SPEAKER:*  Then we don't have to guess.

2   And then -- and then I'm the willing to make a dealers choice

3   on their part about where they want to test it.  I'll trust

4   them to say, hey, it moved from over there, it was in a truck,

5   and it came over here.

6      *THE COURT:*  You are talking about debris -- which

7   debris piles are you talking about; you are talking about all

8   the debris piles?  Or are you talking about the one relating to

9   the building?

10      *UNIDENTIFIED SPEAKER:*  The one relating to the

11   building, because I understand they are not going to move the

12   other debris pile, the dirt.

13      *THE COURT:*  That's right.  That's right.  Well, that

14   sounds like a reasonable -- this is Mr. Thompson, right?

15      *MR. THOMPSON:*  Yes, your Honor.

16      *THE COURT:*  So that, to me, sounds like a reasonable

17   way to go about it.  You go over there.  Or you have them point

18   out on the map, so that you know, here are the places that

19   the -- we can point out here where that thing, the debris has

20   been moved and where we intend for it to be moved, it's not

21   going to be moved any place out, and you test in those

22   vicinities.  That's kind of what I thought we were going to do.

23      *MR. THOMPSON:*  Just to explain where Dr. Talcokin

24   *[ph]* was going to the administration building.  I think that's

25   the building we might expect to be lightly impacted.  And, you

1   know, this case is about dust moving out, off, and into

2   buildings.  There's a unique contaminative concern that we find

3   associated with this path, you know, that would not be a

4   contaminative concern that we might find in the primary UF6

5   building.  Then that could be a marker that this is moving.  I

6   think we can pull that off, because we could only go to the

7   administration building -- I think Mr. Galvin makes a good

8   point, they probably are not going to move the administration

9   building.

10          THE COURT:  Right.

11          MR. THOMPSON:  So I mean we can go always go back and

12   test that later once we got this debris pile and the path by

13   which it went.

14          THE COURT:  Yeah.  That makes sense.

15          MR. THOMPSON:  Since we are walking by that pile of

16   dirt, of soil, you know, we could just dip a trowel in and take

17   that out.  And the next time we come back, for the big site, we

18   don't have to worry about any of this debris or outside, we

19   could just take a trowel and get a sample out of dirt pile and

20   we're good, and that's going to take 15 minutes.

21          THE COURT:  So you can take the dirt pile, you are

22   talking about in Area 1, correct?

23          MR. THOMPSON:  Yeah.

24          THE COURT:  The soil storage area.  And then the area

25   around demolished building SF6, and the pathway from which it

1    would be removed for the site?

2            *MR. DANEKER:*  Your Honor --

3            *THE COURT:*  Hang on.  Let me just make sure that

4    that's -- I'm clear on what Mr. Thompson is proposing.

5            *MR. THOMPSON:*  That's my proposal.

6            *THE COURT:*  And now back to the defense, Mr. Daneker.

7            *MR. DANEKER:*  Sorry, your Honor, to interrupt.

8            *THE COURT:*  That's all right.  Go ahead.

9            *MR. DANEKER:*  Just to be clear, the pathway by which

10   it is being removed, as I understand it, is a railcar on a rail

11   line.  So, we would be talking about where the debris pile is,

12   and then where it is loaded onto a closed railcar.

13           *THE COURT:*  If that turns out to be the case, that

14   should provide an easy basis from which you can agree upon a

15   reasonable, you know, area to test.  Right?

16           *MR. THOMPSON:*  That sounds reasonable to me, yes.

17           *THE COURT:*  Okay.  And this makes sense.  We get this

18   taken care of.  And I agree, go ahead take -- you know, if it's

19   only going to take 15 more minutes, we know where the soil pile

20   is, go ahead and take that, too.  It was a topic that we

21   discussed last time.  And so it's -- those are the things we'll

22   do this first time.  Modify this agreement accordingly.  And we

23   should be good.

24           *MR. THOMPSON:*  All right.  Thank you, your Honor.

25           *THE COURT:*  Mr. Daneker or Mr. Galvin anything else?

1          *MR. DANEKER:*  I believe, your Honor, that we can work

2  the remaining conditions out with the plaintiffs.

3          *THE COURT:*  Okay.

4          *MR. DANEKER:*  I wanted to flag that there were a few

5  other ones.

6          *THE COURT:*  Do you want me to address those?  I'm

7  sorry.  This was the main one.

8          *MR. DANEKER:*  We had -- we have respond to their

9  protocol with a couple of others.  The one that is the most

10  important is that:  Pursuant to our nuclear regulatory

11  commission license we cannot allow material, if it's above a

12  certain radioactive level, to leave the site unless it is

13  properly labeled and being shipped to a laboratory that is

14  authorized by the federal government to accept it.  And so,

15  we've written this into our response to the protocol, but we

16  have to have the ability to inspect whatever samples they take

17  and to do a quick screen on them just to make sure that it

18  doesn't rise above those levels or, if it does, it is properly

19  packaged and sent to the laboratory in the right way.

20          *THE COURT:*  Let me just ask real quick before we move

21  onto anything else.  Mr. Thompson or Ms. Carroll, what's the

22  problem with that?

23          *MS. CARROLL:*  We don't have one.

24          *MR. THOMPSON:*  There is no problem with that.  And we

25  will be shipping it to Eberline.  Make sure Mr. Galvin is -- I

1    think that's probably who Honeywell uses.

2         *THE COURT:*  I'm sorry.

3         *MR. THOMPSON:*  I said I think that's probably who

4    Honeywell uses is Eberline Laboratories, shipping to Oak Ridge.

5         *THE COURT:*  Okay, great.  What else, Mr....

6         *MR. DANEKER:*  Daneker, I think.

7         *THE COURT:*  Yeah.  What else, Mr. Daneker.  I'm sorry

8    I keep looking down at different parts of my sheet.  Go ahead.

9         *MR. DANEKER:*  Just a couple of them.

10        Obviously, the plaintiffs' -- I don't think these are

11   controversial.  But the plaintiffs' representatives will need

12   to go through our safety training and will need to be escorted

13   at all times.

14        *MR. THOMPSON:*  Certainly.  Absolutely.

15        *THE COURT:*  Okay, we got that.  What else?

16        *MR. DANEKER:*  And the plaintiffs have requested video

17   and photography.  We are okay with it but, because it is an NRC

18   licensed facility, we would request the video and photography

19   be limited to the sampling activity and the sampling area.

20        *MR. THOMPSON:*  That would be the reason we would be

21   doing the video and photography to confirm the samples; so for

22   this event, that certainly is reasonable and what we would plan

23   to do.

24        *THE COURT:*  Okay.  Great.  All right.

25        *MR. THOMPSON:*  Except -- one thing.  When we do that,

1    we need to get an establishing shot.  There might be something

2    in the background so you can -- 'cause if you take a shot of

3    somebody with the trowel you don't know where they are.

4            MR. DANEKER:  We understand.

5            MR. THOMPSON:  Okay.

6            THE COURT:  Fair enough.  Anything else?

7        Okay, this makes sense.  And again, you know, this is

8    the -- this all makes sense to me as the exigent circumstance,

9    and any other testing we will deal with later on.

10           Okay, great.  Thank you.  Court's adjourned.

11                   (Court adjourned)

12                        -oOo-

13                REPORTER'S CERTIFICATE

14       I, Molly N. Clayton, RPR, FCRR, Official Court Reporter
     for the U.S. District Court, Southern District of Illinois, do
15   hereby certify that I reported with mechanical stenography the
     proceedings contained in pages 1 - 23; and that the same is a
16   full, true, correct and complete transcript from the record of
     proceedings in the above-entitled matter.

17

18           DATED this 11th day of August, 2018.

19

20                   s/Molly Clayton, RPR, FCRR
                    _____

21

22

23

24

25